

# THE ATTORNEY GENERAL

# OF TEXAS

### AUSTIN 11, TEXAS

WILL WILSON
ATTORNEY GENERAL

*Reaffirm By*
*M- 84*

July 3, 1957

Texas Game and Fish Commission
Austin, Texas

Opinion No. WW-151

Re: Jurisdiction of the Game
and Fish Commission with
respect to the removal
of "non-merchantable"
material underlying pub-
lic waters.

Gentlemen:

By letter dated April 4, 1957, you state that the Com-
mission "anticipates being faced with the decision as to
whether or not it has any official jurisdiction in the matter
relating to the construction of a navigable channel in Gal-
veston Bay." While you now and in the past have asserted juris-
diction in the bay areas with respect to the commercial sale
of sand, shell, gravel and marl, you advise that you have
neither exercised nor asserted jurisdiction with respect to
dredging in connection with a project not involving the com-
mercial sale of the materials mentioned. You conclude with
a request for an opinion from this office "as to whether the
Game and Fish Commission is charged by law with issuing per-
mits for the removal or displacement of non-merchantable
material" from the bay.

Prior to 1911 the public generally was free, without
control or supervision, to remove mudshell, sand, gravel and
other materials from the bottoms underlying the public waters
of this State. Gore v. City of Rosenberg, 115 S.W. 663, (Tex.
Civ. App., 1909, no writ history).

It is fairly inferable that the Gore case, supra, fo-
cused the attention of the Legislature on the situation then
existing, for that body in 1911 enacted the first laws de-
signed for the protection of the bottoms underlying the pub-
lic waters and the marine life contained therein. (S.B. 348,
Gen. Laws, 32nd Leg., ch. 68, p. 118).

The basic enactment, although amended several times
in minor ways, in the 1911 Special Session, in 1919, in 1925,
and finally in 1951, has for all purposes material to the

present inquiry remained unchanged. The pertinent portions thereof are now codified as Articles 4051, 4052, and 4053, V.A.C.S.[1] It is unnecessary to quote verbatim all of the provisions of these statutes. Suffice it to say that Article 4051 provides that: "All of the islands, reefs, bars, lakes and bays . . . together with all of the marl and sand of commercial value, and all the shells, mudshell or gravel of whatsoever kind" were included within the provisions of the Act and were thereby "placed under the management, control and protection of the Commissioner." Article 4052 vests in the Commissioner "all the powers and authority necessary to carry into effect the provisions" of the Act and directs that the Commissioner shall have "full charge and discretion over all matters pertaining to the sale, the taking, the carrying away or disturbing of all marl, sand or gravel of commercial value, and all gravel and shells or mudshell and oyster beds and their protection from free use and unlawful disturbing or appropriation of same" except as provided in the Act.

Finally, germane to the question under consideration, the Legislature prescribed in Article 4053 the procedure and conditions under which persons may purchase marl and sand of commercial value "or otherwise operate" in the public lands and waters included within the provisions of the Act. Thus provision is made for an application therefor to the Commissioner and if, after investigation, that agency is satisfied "that the taking, carrying away or disturbing of the marl, gravel, sand, shell or mudshell . . . would not damage or injuriously affect" the waters and land included in the Act "nor change or injuriously affect any current that would affect navigation" a permit may be issued after the applicant "shall have complied with all requirements described by the Commissioner."[2]

From a reading of the pertinent statutes, it is plain that the paramount intention of the Legislature was and is the protection of oyster beds, fish and fish breeding grounds. True, provision is also made for the commercial disposition of the materials on the bottoms and shores of the areas under consideration. This disposition, however, wisely was placed in the State agency most familiar with and staffed with personnel trained for the protection of the waters and marine life affected thereby. It is significant, too, that Article 4051 refers to materials "of commercial value" and materials "of whatsoever kind"; Article 4052 specifies, in addition to "commercial materials", that the Commissioner shall protect from free use or unlawful disturbing all gravel and shells or mudshell and oyster beds"; while Article 4053 pertains to persons desiring to purchase "or otherwise operate in any of the waters" or area in question.

By *James H. Rogers*
James H. Rogers
Assistant

JHR:bk

APPROVED:

OPINION COMMITTEE
H. Grady Chandler, Chairman

---

[1] The office of Game, Fish and Oyster Commissioner was abolished and in its stead and with its powers was created the Game, Fish and Oyster Commission. Acts 1929, 41st Leg.; ch. 118, p. 265. The office of Game, Fish and Oyster Commission was abolished and in its stead and with its powers was created a Game and Fish Commission. Acts, 1951, 52nd Leg., p. 850,ch. 476, codified as Article 978f-3, Sec. 1, V.P.C. Hence where the statutes under consideration use the word "Commissioner", the agency affected is the Game and Fish Commission.

[2] The precise question under consideration has not been adjudicated. For a construction of these statutes with respect to commercial activity, see Columbia-Southern Chemical Corp. v. Corpus Christi Shell Company, 297 S.W. 2d 191 (San Antonio Civ. App., 1956, no writ history). The opinion of the court is neither inconsistent with nor corroborative of the views expressed herein.

As above indicated, the original act of 1911 has been brought forward into present law with no substantial change as far as the present question is concerned. It is interesting to note that the emergency clause in that Act supports the views expressed herein. Such clause provides in part

"The fact that large quantities of the marl, sand and shells or mudshell on the coast are being taken and carried away daily and the oyster beds and fish breeding waters are being disturbed and ruined, and there being no statute protecting same from wanton destruction creates an emergency . . ." (Sec. 10, S.B. 348, Gen. Laws, 32nd Leg., 1911, p. 118, ch. 68.)

We think it beyond serious question that conservation and protection of marine life and breeding grounds was and is the chief purpose of the Act under consideration. Commercial sales are incident thereto.

Should it be argued that the protection of the marine life and breeding areas was not the main and chief purpose of the Act, such a goal, nevertheless, was at the very least a specified objective thereof. Since "non-commercial dredging" would have precisely the same effect in this respect as "commercial dredging" it follows that "non-commercial" activity or operation in the area in question is within the terms of the Act.

We, therefore, are of the opinion, and so advise, that you legally have the jurisdiction and responsibility for the issuance of permits to dredge the unpatented lands underlying public waters in this State regardless of the purpose, commercial or otherwise, of such dredging.

### SUMMARY

The Game and Fish Commission is charged by law with the determination and the issuance of permits for the removal or displacement of non-merchantable materials from the unpatented lands underlying the public waters of this State.

Very truly yours,

WILL WILSON
Attorney General of Texas